No. 21-12791

# In the United States Court of Appeals
# for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

NAPOLEON HARRIS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Middle District of Florida, Tampa Division
Case No. 8:12-Cr-00205-SDM-SPF
Hon. Steven D. Merryday

## INITIAL APPEAL BRIEF OF NAPOLEON HARRIS

FRANK LOUDERBACK, ESQUIRE
450 Carillon Parkway, Ste. 120
St. Petersburg, Florida 33716
(727) 896-2147
Florida Bar No. 193295
LoudHel@aol.com

Attorney for Defendant-Appellant

DATED: *April 13, 2022*

**CERTIFICATE OF INTERESTED PERSONS**

**AND**

**CORPORATE DISCLOSURE STATEMENT**

In compliance with FRAP 26.1 and 11th Cir. R. 26.1-1, the undersigned hereby certifies that the following listed persons and entities have an interest in the outcome of this particular case:

1. Adams, Natalie H. – Assistant United States Attorney;

2. Beck, Kevin T. – Counsel for Appellant's Co-Defendant;

3. Bentley, A. Lee, III – former United States Attorney, Middle District of Florida;

4. Borghetti, Anne F. – Counsel for Appellant's Co-Defendant;

5. Brunvand, Bjorn E. – Counsel for Appellant's Co-Defendant;

6. Crawford, Stephen – Counsel for Appellant's Co-Defendant;

7. Farmer, Matthew P. – Counsel for Appellant's Co-Defendant;

8. Fitzgerald, Timothy J. – former Counsel for Appellant's Co-Defendant;

9. Flynn, Hon. Sean P. – United States Magistrate Judge;

10. Furr, III, Walter E. – Assistant United States Attorney;

11. Fussell, David – former Counsel for Appellant;

12. Gonzalez, Brian E. – former Counsel for Appellant's Co-Defendant;

13. Green, Charlie L. – Appellant's Co-Defendant;

14. Green, Jr., Jerry W. – Appellant's Co-Defendant;

15. Gwinn, Laura J. – United States Department of Justice;

16. Handburg, Roger – United States Attorney;

17. Harris, Corey D. – Appellant's Co-Defendant;

18. Harris, Napoleon – Appellant;

19. Harris, Nathaniel – Appellant's Co-Defendant;

20. Hernandez, Daniel M. – Counsel for Appellant's Co-Defendant;

21. Kovachevich, Hon. Elizabeth A. – United States District Court Judge;

22. Lenamon, Terrence M. – former Counsel for Appellant's Co-Defendant;

23. Lopez, Maria Chapa – Former United States Attorney, Middle District of Florida;

24. Louderback, Franklyn – Counsel for Appellant;

25. Malone, Steven H. – former Counsel for Appellant's Co-Defendant;

26. Martin, Deonte J. – Appellant's Co-Defendant;

27. McCoun, III, Hon. Thomas B. – United States Magistrate Judge;

28. McNamara, Linda Julin – Assistant United States Attorney, Deputy Chief, Appellate Division;

29. Merryday, Hon. Steven D. – United States District Court Judge;

30. Muench, James – Assistant United States Attorney;

31. Muldrow, W. Stephen – former United States Attorney, Middle District of Florida;

32. Murray, Christopher – Assistant United States Attorney;

33. Pizzo, Hon. Mark A. – United States Magistrate Judge;

34. Potolsky, Steve – former Counsel for Appellant's Co-Defendant;

35. Rhodes, David P. – Assistant United States Attorney, Chief, Appellate Division;

36. Villanueva, Angel – Appellant's Co-Defendant; and

37. Woelfle, Marty – United States Department of Justice.


/s/ Frank Louderback
FRANK LOUDERBACK, ESQ.

**STATEMENT REGARDING ORAL ARGUMENT**

The issues raised on appeal are complex and Appellant believes that oral argument will aid the Court's disposition of those issues.

# TABLE OF CONTENTS

Certificate of Interested Persons..........................................................................C-1

Statement Regarding Oral Argument .................................................................. i

Table of Contents................................................................................................ ii

Table of Citations............................................................................................... iv

Statement Regarding the Adoption of Briefs of Other Parties ............................ vii

Statement Regarding Subject-Matter and Appellate Jurisdiction........................ viii

Statement of Issues Presented for Review ..............................................................1

Statement of the Case.............................................................................................2

    A. Course of Proceedings.................................................................................2

    B. Statement of Facts .....................................................................................4

    C. Disposition Below ...................................................................................13

Summary of the Argument...................................................................................15

Argument and Citations of Authority ..................................................................16

## I.

### THE DISTRICT COURT ERRED IN CONDUCTING A LIMITED RESENTENCING

THE DISTRICT COURT ERRED IN CONDUCTING A
LIMITED RESENTENCING ..................................................................16

    A. Standard of Review ..................................................................................16

    B. Napoleon's sentences were vacated.........................................................16

**II.**

**THE STATUTORY MAXIMUM SENTENCE UNDER COUNT ONE FOR RICO CONSPIRACY IS 20 YEARS' IMPRISONMENT** ......................................................................18

A. Standard of Review ................................................................18

B. Indictment failed to charge any enhanced penalty provision ...................18

**III.**

**THE DISTRICT COURT'S DETERMINATION OF DRUG QUANTITIES IS NOT SUPPORTED BY THE EVIDENCE**................20

A. Standard of Review .................................................................20

B. Drug quantity determination unsupported..............................20


Conclusion .................................................................................21

Certificate of Service ...............................................................22

Certificate of Font Compliance ...............................................22

<h1 style="text-align:center">TABLE OF CITATIONS</h1>

**Cases**                                                                 **Page**

*Alleyne v. United States,*

    570 U.S. 99 (2013) ........................................................................15, 19

*Apprendi v. New Jersey,*

    530 U.S. 466 (2000) ................................................................15, 18, 19

*United States v. Cotton,*

    535 U.S. 625 (2002) ........................................................................19

*United States v. Almedina,*

    686 F.3d 1312 (11th Cir. 2012) ........................................................20

*United States v. Brown,*

    752 F.3d 1344 (11th Cir. 2014) ........................................................19

*United States v. Burke,*

    863 F.3d 1355 (11th Cir. 2017) ........................................................17

*United States v. Cochran,*

    883 F.2d 1012 (11th Cir. 1989) ........................................................17

*United States v. Davis,*

    329 F.3d 1250 (11th Cir. 2003) ........................................................16

*United States v. Fowler,*

    749 F.3d 1010 (11th Cir. 2014) ........................................................4, 17

*United States v. Green*,

    981 F.3d 945 (11th Cir. 2020) .........................................4, 17, 18, 19

*United States v. Martinez*,

    606 F.3d 1303 (11th Cir. 2010) ...............................................16, 17

*United States v. Nguyen*,

    255 F.3d 1335 (11th Cir. 2001) .......................................................18

*United States v. Prouty*,

    303 F.3d 1249 (11th Cir. 2002) .......................................................16

*United States v. Singleton*,

    545 F.3d 932 (11th Cir. 2008) .........................................................20

*United States v. Stinson*,

    97 F.3d 466 (11th Cir. 1996) ...........................................................17

*United States v. Wilson*,

    884 F.2d 1355 (11th Cir. 1989) .......................................................20

**Statutes**

18 U.S.C. § 922(g) ...............................................................................3

18 U.S.C. § 924(c) ...................................................................... 2, 4, 18

18 U.S.C. § 924(j) ...............................................................................2

18 U.S.C. § 1962(d) .................................................................... 2, 4, 18

18 U.S.C. § 1963(a) ...................................................................15, 18, 19

21 U.S.C. § 841(a)(1) ................................................................ 2

21 U.S.C. § 841(b)(1) ................................................................2

21 U.S.C. § 846................................................................2

28 U.S.C. § 1291 ................................................................ viii

**STATEMENT REGARDING THE ADOPTION
OF BRIEFS OF OTHER PARTIES**

Napoleon Harris adopts the brief of co-Appellants Charlie Green, Issue One, and Jerry Green, Issue One, which corresponds to Issue One in Appellant's brief, *infra*, regarding the claim that the statutory maximum sentence for a generic RICO conspiracy is 20 years' imprisonment.

**STATEMENT OF SUBJECT-MATTER
AND APPELLATE JURISDICTION**

This Court has jurisdiction to review the final judgment of the District Court pursuant to 28 U.S.C. § 1291. The District Court entered a final judgment on August 10, 2021. (Doc. 1607). Harris filed a notice of appeal on August 12, 2021. (Doc. 1611).

**STATEMENT OF ISSUES**

I.     WHETHER THE DISTRICT COURT ERRED BY NOT CONDUCTING A DE NOVO RESENTENCING HEARING?

II.    WHETHER 20 YEARS' IMPRISONMENT IS THE STATUTORY MAXIMUM SENTENCE UNDER COUNT ONE?

III.   WHETHER THE DISTRICT COURT ERRED IN ITS DRUG QUANTITY DETERMINATION?

**STATEMENT OF THE CASE**

**A.    Course of Proceedings**

On May 29, 2014, a federal grand jury in the Middle District of Florida, Tampa Division, returned a 28-count Second Superseding Indictment ("SSI"), nine of which were against Napoleon Harris ("Napoleon").[1] (Doc. 82).

As relevant here, Count One of the SSI alleged a RICO Conspiracy in violation of 18 U.S.C. § 1962(d) but failed to allege any penalty provision.

Count Two alleged that, beginning on an unknown date no later than January 1, 2006, and continuing until the date of the SSI, the defendants conspired to distribute and to possess with intent to distribute one kilogram or more of heroin, MDMA, Oxycodone; 100 kilograms or more of marijuana, 5 kilograms or more of cocaine, and 280 grams or more of cocaine base, contrary to 21 U.S.C. § 841(a)(1), and §§ 846, 841(b)(1)(A), (B), and (C). (Doc. 82).

Count Five alleged that, on or about October 26, 2010, Napoleon and others knowingly used, carried and discharged a firearm during and in relation to Count One of the SSI during a crime of violence causing the death of Demetrius Cunningham through the use of a firearm in violation of 18 U.S.C. §§ 924(c), 924(c)(1)(A)(iii), 924(j)(1), and 2.

---

[1] Because multiple siblings with the same last name are parties, we refer to them by their first name to avoid confusion.

Count Twenty-Four alleged that, on or about July 20, 2013, Napoleon knowingly possessed, in and affecting interstate commerce, ammunition, which was used in the attempted murder of C.P. and C.S., after having been previously convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 2.

On September 8, 2016, the jury returned a verdict of guilty on counts One, Two, Five, and Twenty-Four. The jury acquitted Napoleon on Counts Six, Seventeen, Nineteen, Twenty-Three, and Twenty-Five. (Doc. 1183).

In the special findings on the verdict form for Count One, the jury found Napoleon guilty of committing the kidnapping of Calvin Barnes in paragraph (A), which was based on the allegation in paragraph 31 of Count One. (Doc. 1183.)

On January 18, 2017, Napoleon was sentenced to life imprisonment on Counts One, Two, and Five; ten (10) years on Count Twenty-Four, and life imprisonment on Count Five, consecutive to the sentence imposed on Counts One, Two and Twenty-Four. The district court also imposed a term of supervised release of ten (10) years on Count Two, five (5) years on Count One and three (3) years on Count Twenty-Four, all to run concurrently. Restitution of $8,000.00 was awarded and a special assessment of $100.00 on each of four counts. (Doc. 1296).

On direct appeal, Napoleon made multiple arguments, including that the district court erred in denying the motion for judgment of acquittal on Count Five,

the § 924(c) count, because the predicate offense, RICO conspiracy (18 U.S.C. § 1962(d)), is not a crime of violence as defined by 18 U.S.C. § 924(c)(3). Napoleon also argued that the district court erred in calculating his sentence under Count Two because the drug quantity attributed to him was not supported by the evidence at trial.

In *United States v. Green*, 981 F.3d 945 (11th Cir. 2020), this Court reversed and remanded. Napoleon's § 924(c) conviction under Count Five -- predicated on the RICO conspiracy charged in Count One -- was vacated. Citing *United States v. Fowler*, 749 F.3d 1010 (11th Cir. 2014), this Court vacated the sentences "on all counts." *Green*, 981 F.3d at 961. In footnote ten of the opinion, the Court stated that "Charlie and Napoleon raise issues with their sentences, but because we vacate their sentences, those issues are moot." *Id*.

Napoleon Harris is presently incarcerated.

**B.    Statement of Facts**

In the light most favorable to the government, the testimony at trial regarding drug quantity attributable to Napoleon was as follows.

Lawanda Evans testified that she saw Napoleon Harris sell marijuana when he lived at his father's home in 1998-1999. (Doc. 1399 at 126).

Donald Garrison witnessed Napoleon in possession of approximately 1-gram of crack cocaine behind his mother's house. (Doc. 1401 at 17).

Juan Carlos Hernandez testified that Napoleon and his brothers sold cocaine to the Brown Pride Locos (BPL), a gang in the Bradenton area. (Doc. 1401 at 120). Once or twice a month, over a period of three to four years, BPL would purchase two to three bricks (a kilo) of cocaine from Nathaniel, Napoleon, and Charlie at different locations. (Doc. 1401 at 123-24). Hernandez testified BPL introduced Napoleon and his brothers to heroin. (Doc. 1401 at 125-26). One-time, when the BPL was buying cocaine from Napoleon and his brothers, Cesar Molando (C-Lo) the boss of BPL, tossed a finger of heroin to Napoleon. Molando suggested Napoleon's friends should check out the heroin. (Doc. 1401 at 126). From that point on, BPL continued to deliver heroin to Napoleon. (Doc. 1401 at 126-27). Napoleon and his brothers would sell a finger[2] of heroin for $1,200.00 to $1,300.00. (Doc. 1401 at 127). According to Hernandez, Napoleon sold marijuana from his car and delivered it to Molando at his house. (Doc. 1401 at 131).

Ledale Johnson testified he purchased crack cocaine from Napoleon four or five times over a period of two years at a BP gas station in Bradenton. According to Johnson, Napoleon would be there every morning with another person. Johnson said a "typical deal" with Napoleon would be the purchase of crack cocaine, valued at $75.00 to $200.00. For $75.00, Napoleon would cut the crack cocaine up

---

[2] According to the testimony of Chris Barton, a finger is 10 grams. (Doc. 1409 at 72).

like dime pieces, a method referred to as "double up." Johnson said if you spent $10.00, you made $20.00. (Doc. 1402 at 232). Johnson testified Napoleon handed him crack once. (Doc. 1402 at 233). Johnson believed that Napoleon was a distributer. (Doc. 1402 at 234). He saw Napoleon with a "cookie" (a pancake size of chocolate crack cocaine) four or five times at the BP gas station in 2011 and 2012. (Doc. 1402 at 261, 264).

Villanueva testified that Whitney Howard wanted to purchase an ounce of cocaine from Napoleon. (Doc. 1403 at 33). Napoleon helped his brother, Nathaniel, when Nathaniel was released from prison by giving him $500.00 and a half ounce of cocaine to get him started. (Doc. 1403 at 141). Villanueva was with Nathaniel when he asked Napoleon to cook some heroin for him. Napoleon refused, so Nathaniel shot up Napoleon's car. (Doc. 1403 at 221). Nathaniel threatened to kill Napoleon for not cooking the heroin. (Doc. 1403 at 223). Villanueva stated Napoleon owed money to him for an ounce of cocaine. (Doc. 1404 at 31). Napoleon was listed in Villanueva's phone directory for his drug trade. (Doc. 1404 at 37). Villanueva said that Napoleon took over his drug trade when he went to jail. (Doc. 1404 at 38).

Christopher McDaniels (C-Lo) testified that he had a discussion with Napoleon about cutting heroin to increase profits and taking it to Miami. (Doc. 1427 at 92-93). He made contact with Napoleon at The Gates of Bradenton where

Napoleon had an apartment. (Doc. 1427 at 94). Napoleon told McDaniels that he had just finished "cooking half a bird" (turning powdered cocaine into crack; 1/2 a kilo or 500 grams of cocaine). (Doc. 1427 at 95). McDaniels testified Napoleon said he and his brothers controlled the drug trade from 301 to Cortez Road in Manatee County. (Doc. 1427 at 97).

Kylie Lee testified that she purchased crack cocaine from Napoleon, Lil Brown, and J Baby ten times for a period of six months or less. (Doc. 1405 at 121). She purchased crack specifically from Napoleon, two or three times, by calling his cell phone number directly. (Doc. 1405 at 122).

Tauvolous Smith (Chico Black) testified that he witnessed Napoleon and his brothers selling crack cocaine out of their house as teenagers. (Doc. 1405 at 13). Smith stated that Napoleon sold crack out of a trap house next to where Smith was staying when he got out of jail. (Doc. 1406 at 18). Smith purchased nine ounces of cocaine from Nathaniel and Napoleon under the condition that he bring back $850.00 for each ounce for which he sold at $1,050.00 an ounce. (Doc. 1406 at 21). At one point, Smith returned the cocaine to Nathaniel and complained it was bad. (Doc. 1406 at 22). Napoleon cooked an ounce of the crack and confirmed it was bad. (Doc. 1406 at 23). Smith testified Villanueva gave a couple of ounces of cocaine to Napoleon without any money exchanging hands. (Doc. 1406 at 28). Smith specified that Napoleon and Joshua Smith (J-Baby) had a trap house at

Bayshore where they ran a drug business. (Doc. 1406 at 32-33). According to Smith, Joshua would get 100 pieces of crack from Napoleon at that location without any money exchanging hands. (Doc. 1406 at 35). Smith testified to an argument between Nathaniel and Napoleon. Nathaniel requested Napoleon cook up cocaine. Napoleon refused. Nathaniel took out a gun and shot Napoleon in the foot. (Doc. 1406 at 40-41). Napoleon tried to leave. Nathaniel told his brother not to run and put a gun to Napoleon's face. (Doc. 1406 at 43).

Edward Williams testified he purchased crack cocaine from Napoleon in 2012 for the first time in the parking lot of the Sheridan Apartments in Bradenton. He asked for a "20" and Napoleon sold him a "20." (Doc. 1406 at 173). At another time, Napoleon handed Williams $10.00 and some crack in exchange for a personal favor. (Doc. 1406 at 174-75).

Christopher Barton testified that Napoleon sold him crack when he was a kid. (Doc. 1407 at 179). Napoleon contacted Barton after Nathaniel went to jail and told him that he was taking over Nathaniel's drug business from that point on. (Doc. 1407 at 180). Napoleon was Barton's source for powder cocaine until Barton was arrested. (Doc. 1407 at 181). In addition to cocaine, Barton also purchased heroin from Napoleon. (Doc. 1407 at 232). Barton added that he went to Napoleon's father's house to purchase cocaine from Napoleon. (Doc. 1409 at 39-40). He identified a brick (powder cocaine) in a photograph of Napoleon. (Doc.

1409 at 69). On two separate occasions, Barton purchased ten fingers (100 grams) of cocaine from Napoleon. (Doc. 1409 at 71). Barton testified a finger of cocaine costs $1,000.00 and he purchased $10,000.00 worth. (Doc. 1409 at 73). When Nathaniel went to jail in 2011, he purchased directly from Napoleon for the first six months. (Doc. 1409 at 82). Barton stated Napoleon was only a marijuana user, not cocaine or heroin. (Doc. 1409 at 136).

John Green testified that he purchased three to four ounces and a baby (half an ounce) of powdered cocaine from Napoleon every few days. (Doc. 1408 at 150). He stated J-Baby was a runner (seller) for Napoleon. (Doc. 1408 at 151). Green purchased cocaine from Napoleon since he was released from jail in 2013. (Doc. 1408 at 179).

Yasmin Montay testified that Carlos Jurado would deliver a few ounces of cocaine to Napoleon throughout 2012. (Doc. 1408 at 238). The transactions would take place inside of one of three of Napoleon's houses. (Doc. 1408 at 241). Montay was at Napoleon's house with Jurado where she witnessed three deals (a few ounces of powder cocaine) between the two men in 2011. (Doc. 1408 at 243). Montay explained Jurado would go inside the house with cocaine and come back outside empty handed. (Doc. 1408 at 244). Jurado would drop off cocaine to Napoleon every couple of weeks during the years of 2011 and 2012. (Doc. 1408 at

245). Montay stated that she did not go into the house for every deal. (Doc. 1408 at 246).

Irma Gonzalez testified Napoleon and Carlos Jurado had a package of cocaine on her kitchen table. (Doc. 1410 at 93).

Ernest Zinnermom testified Willie Miller and his brothers were part of Napoleon's crew. Napoleon brought them numerous amounts of cocaine. (Doc. 1412 at 101-02). The first drug deal Zinnermom did with Napoleon was at Lottie Millers' house. Napoleon handed him 35 pieces of crack for $300.00. (Doc. 1412 at 104). The second deal was at Lamont's house. (Doc. 1412 at 104-5). Napoleon would hand him crack cocaine directly. He would pay Napoleon in cash for the drugs. (Doc. 1412 at 106).

Eric Neri testified Napoleon sold crack cocaine. (Doc. 1412 at 212). Neri said he began purchasing drugs from Napoleon in 2013. (Doc. 1412 at 220).

According to Neri, Napoleon would front a pound of marijuana to Neri with the understanding that Neri would pay $800.00 when he finished selling it. (Doc. 1412 at 223). Napoleon would supply him every two to three days. He would go to Caldwell's house and Napoleon would hand Neri the drugs. Neri said that Napoleon had two trap houses in 2103 where he sold marijuana, crack, and heroin. (Doc. 1412 at 234).

Stevie Lamar Mays testified that Napoleon gave him 20 grams of crack to help him when he got out of jail. From that point on, he continued to sell for Napoleon on a regular basis. (Doc. 1415 at 233).

Anthony Fernando Abreu de La Cruz testified he witnessed a heroin deal between Napoleon and Oliver Santana Garcia (Rambo). (Doc. 1416 at 78). He states towards the end of July 2013, Rambo went to his car wash and picked up 100 grams of heroin divided up into fingers (ten grams of heroin per finger) and left it at Napoleon's house. (Doc. 416 at 79-80). It was sold to Napoleon for $10,000.00 or $1,000.00 per finger. (Doc. 1416 at 81).

Travontz Dean testified that he met Napoleon in June of 2013 and purchased "four and a baby" (4.5 ounces) of cocaine for distribution. (Doc. 1417 at 116-17). Dean would pull up in front of Napoleon's father's house, roll down his window, and Napoleon handed the drugs to him. (Doc. 1417 at 118). Dean, in return, handed Napoleon $6,200.00 cash. (Doc. 1417 at 119). Two or three days later, Dean received four and a half ounces of cocaine from Napoleon in Lincoln Park. (Doc. 1417 at 120). He paid Napoleon $6,200.00 for that cocaine. (Doc. 1417 at 121). Another two or three days later, Dean made a third deal of four and a half ounces for the same amount of money.

According to Dean, this continued for twelve or thirteen times between June and November 2013. (Doc. 1417 at 123). At one point, Napoleon complained that

Dean was coming too often. He required Dean to purchase nine ounces and Napoleon would front him another nine ounces. Dean paid Napoleon $8,000.00 for nine ounces and Napoleon gave him 18 ounces. When Dean returned, he would give Napoleon $16,000.00 for the first half that was fronted to him and the additional half that he was purchasing. In total, Dean would walk away with eighteen ounces ("half a kilo" or "500 grams" or "1.1 pounds"). The most Dean purchased at one time from Napoleon was one kilo. The deal for one kilo took place in Lincoln Park, Palmetto, during the day. (Doc. 1417 at 125). Dean paid Napoleon $32,000.00 for the kilo. (Doc. 1417 at 126). Dean testified Napoleon negotiated the deals, handed him the cocaine, and took the money from him. (Doc. 1417 at 128).

Cali Mora-Higgins testified she purchased crack cocaine from Napoleon to treat post-partum depression. She would meet Napoleon on a dead-end street and he would come out to the car and gave them the drugs. (Doc. 1420 at 34-35).

Mora-Higgins stated she purchased crack cocaine from Napoleon between 2007 and 2008 and in 2012. (Doc. 1420 at 35). She purchased from Napoleon three to five times a week; sometimes every day. Overall, Mora-Higgins bought from Napoleon hundreds of times. (Doc. 1420 at 36). She testified she saw Napoleon with a Ziploc baggie or a Solo cup full of crack cocaine. Mora-Higgins ordered anywhere from $10.00 to $20.00 to $100.00 worth of crack; two dime rocks of

cocaine for $20.00. (Doc. 1420 at 40). She would also purchase $20.00 of heroin from Napoleon in a baggie that was half full (a quarter inch by a quarter inch). (Doc. 1420 at 41-42).

Lashawn White would go to Napoleon's father's home to process large amounts of marijuana. Napoleon would be there with his brothers. (Doc. 1420 at 114). White stated he saw Napoleon cook crack on the stove top of a trap house. (Doc. 1420 at 128).

### C. Disposition in the Lower Tribunal

On remand, the district court questioned whether it had the discretion to resentence Napoleon de novo. (Doc. 1656 at 5-21.) At the resentencing hearing held on August 10, 2021, the district court believed that the only purpose of the remand was to untangle Count Five from the previous sentence imposed. (*Id*. at 14).

At resentencing, the district judge "made no independent determination" of drug quantity. (*Id*. at 27). Similarly, as to the life sentence imposed on Count One, the district court overruled the objection that the maximum sentence was 20 years' imprisonment, stating it "will stand by Judge Kovachevich's ruling for this purpose at this time, because this does not strike me as something that I'm charged with revisiting." (*Id.* at 52).

The district court reimposed life sentences on Counts One and Two and ten years on Count Twenty-Four, all concurrent. A five-year term of supervised release was imposed for Counts One and Two, and a three-year term for Count Twenty-Four, each concurrent. (*Id.* at 78). A special assessment of $100.00 was levied for each of the three counts. (*Id.* at 79).

Notice of Appeal was timely filed by Napoleon on August 12, 2021. (Doc. 1611). These proceedings have ensued.

# SUMMARY OF THE ARGUMENT

The district court erred when it failed to conduct resentencing under a de novo standard. This Court vacated one count of conviction and all of the sentences imposed by the district court. This wiped the slate clean and required the district court to conduct the resentencing hearing as if no initial sentence had been imposed.

The statutory maximum sentence under Count One for RICO conspiracy is 20 years' imprisonment, not life imprisonment. In the initial appeal, this Court expressly determined that the indictment made no reference to 18 U.S.C. § 1963(a) or any enhanced sentence for RICO conspiracy. Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013), any fact which increases a sentence must be charged in the indictment, submitted to a jury, and proved beyond a reasonable doubt.

The failure of the indictment to put Napoleon on notice that a sentence could be imposed under § 1963(a) limits the statutory maximum sentence to a term of 20 years' imprisonment.

The district court's drug quantity determination is unsupported by the evidence at the sentencing hearing. The probation officer engaged in speculation in arriving at the drug quantities set forth in the PSR. In the light most favorable to the government, the evidence at trial does not support the drug quantity findings.

# ARGUMENT

# I.

## THE DISTRICT COURT ERRED IN CONDUCTING A LIMITED RESENTENCING.

### A. Standard of Review

This Court reviews the legality of a sentence de novo. *See United States v. Prouty*, 303 F.3d 1249, 1251 (11th Cir. 2002).

### B. Napoleon's sentences were vacated

The district court believed it had no authority to conduct the resentencing de novo, stating that this Court's remand was ambiguous. This was error because this Court's mandate and remand was not for a limited purpose but for a full resentencing that required de novo review.

In vacating a sentence and remanding for resentencing, an appellate court may enter a general vacatur of the sentence, which allows for resentencing de novo. *United States v. Martinez*, 606 F.3d 1303, 1304 (11th Cir. 2010). Alternatively, a court may issue a limited mandate, which remands for a limited purpose at the resentencing. *Id*.; *see also United States v. Davis*, 329 F.3d 1250, 1252 (11th Cir. 2003). When this Court vacates the sentence, but issues a limited mandate with particular remand instructions, the district court at resentencing is restricted to the issues outlined in the mandate. *Davis*, 329 F.3d at 1252. Unlike a general vacatur, a limited remand does not "nullify all prior proceedings." *Id*. (quotation marks omitted).

In this Circuit, vacatur of a sentence wipes the slate clean requiring a district court to conduct a resentencing as if no initial sentencing ever occurred. *United States v. Burke*, 863 F.3d 1355, 1359 (11th Cir. 2017). When a criminal sentence is vacated, it becomes void in its entirety. The sentence — including any enhancements — has `been wholly nullified and the slate wiped clean. *Martinez*, 606 F.3d at 1304; see also *United States v. Stinson*, 97 F.3d 466, 469 (11th Cir. 1996); *United States v. Cochran*, 883 F.2d 1012, 1017 (11th Cir. 1989).

This Court vacated Napoleon's sentence "on all counts." *Green*, 981 F.3d at 961, and cited the decision in *United States v. Fowler*, 749 F.3d 1010 (11th Cir. 2014). *Fowler* is instructive because that case held:

> when a conviction on one or more of the component counts is vacated for good, the district court should be free to reconstruct the sentencing package (even if there is only one sentence left in the package) to ensure that the overall sentence remains consistent with the guidelines, the § 3553(a) factors, and the court's view concerning the proper sentence in light of all the circumstances.

749 F.3d at 1015.

This Court expressly did not rule on the sentencing issues raised in the initial appeal, stating "Charlie and Napoleon raise issues with their sentences, but because we vacate their sentences, those issues are moot." *Id.*, n.10. This was not a limited remand to untangle the vacated count of conviction. Rather, the district court was required to resentence Napoleon de novo and its failure to do so was error.

## II.

## THE STATUTORY MAXIMUM SENTENCE UNDER COUNT ONE

## FOR RICO CONSPIRACY IS 20 YEARS' IMPRISONMENT.

### A. Standard of Review

A claim that a sentence exceeds the applicable statutory maximum in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), is reviewed de novo. *United States v. Nguyen*, 255 F.3d 1335, 1343 (11th Cir. 2001).

### B. Indictment failed to charge any enhanced penalty provision

The district court erred when it imposed a life sentence on Count One because the operative indictment failed to charge anything beyond the conventional RICO conspiracy found in 18 U.S.C. § 1962(d). This Court determined in the first appeal that the indictment in this case did not charge Napoleon with any enhanced RICO offense under 18 U.S.C. § 1963(a). The Court held that:

> Neither the indictment nor the jury instructions referenced § 1963(a)
> —and the first time the government proposed that these appellants
> were charged or tried for a crime other than conventional RICO
> conspiracy was after the briefs were filed, in a "supplemental"
> authority letter. Thus, the indictment's omission of any reference to
> aggravated RICO conspiracy or § 1963(a) is not merely a "citation
> error" as contemplated by Federal Rule of Criminal Procedure 7(c)(2).
> The government cannot salvage the appellants' § 924(c) convictions
> by reimagining the charged crimes.

*Green*, 981 F.3d at 952.

*Apprendi* held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Subsequently, *Alleyne v. United States*, 570 U.S. 99 (2013), catalogued historical precedent that reaffirmed the principle that an indictment must contain an allegation of every fact which is legally required for the punishment to be inflicted. *Id.* at 108-112. *Alleyne* concluded that "[d]efining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment." 570 U.S. at 113-14. *See also United States v. Cotton*, 535 U.S. 625, 627 (2002) (Fifth and Sixth Amendments require that those same facts "also be charged in the indictment."); *United States v. Brown*, 752 F.3d 1344, 1351 (11th Cir. 2014) (stating that "any facts that increase the penalty for a crime beyond the prescribed statutory maximum ... are essential elements of the offense that must be included in the indictment....") (internal quotation marks omitted).

This Court previously concluded that the indictment contained no allegations of an aggravated RICO conspiracy or to any enhanced penalty under § 1963(a). *Green*, 981 F.3d at 952. Thus, under *Apprendi* and *Alleyne*, the statutory maximum penalty for Count One is 20 years' imprisonment and the district court's imposition of a life sentence was erroneous.

# III.

# THE DISTRICT COURT'S DETERMINATION OF DRUG QUANTITIES IS NOT SUPPORTED BY THE EVIDENCE.

## A. Standard of Review

A district court's determination of the quantity of drugs attributable to a defendant is reviewed for clear error. *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012). The government bears the burden of establishing the drug quantity attributable to a defendant by the preponderance of the evidence. *Id*. A district court's factual findings at sentencing may be based on facts admitted by a defendant's guilty plea, undisputed PSR facts, or evidence presented at a sentencing hearing. *United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989). Calculation of drug quantities must be fair, accurate and conservative and cannot be speculative. *United States v. Singleton*, 545 F.3d 932, 934 (11th Cir. 2008).

## B. Drug quantity determination

The PSR attributed the following drug quantities to Napoleon:

Heroin - 31.2 kilograms (31,200 grams) (39 months x 800 grams)

Cocaine - 236 kilograms (59 months x 4 kilograms)

Crack cocaine - 6.6 kilograms (6,667 grams) (59 months x 113 grams)

Marijuana - 2,360 kilograms (59 months x 40 kilograms)

(Doc. 1265 at 27).

The government did not establish the above quantities by the preponderance of the evidence. Rather, the probation officer calculated a monthly figure of each type of drug and took the total alleged period of the drug conspiracy in months, subtracted any months that any one of the various defendants may have been in custody during that time period, and then multiplied that figure by the months that they were on the street. (Doc. 1457 at 16-17). This was nothing more than speculation.

The government's calculation of drug quantities was plainly inadequate to carry its burden of proof at sentencing and the district court erred in overruling Napoleon's objections to those quantities.

## CONCLUSION

The sentences imposed by the district court must be reversed.

Respectfully submitted,

/s/ Frank Louderback

FRANK LOUDERBACK, ESQ.
450 Carillon Parkway, Ste. 120
St. Petersburg, FL 33716
(727) 896-2147; Fax (727) 556-0447
FBN 193295
LoudHel@aol.com
Attorney for Defendant-Appellant

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the original and four (4) copies of the foregoing have been furnished by U.S. Mail to the U.S. Court of Appeals, Eleventh Circuit, located at 56 Forsyth Street, N.W., Atlanta, GA 30303 and true and correct copies of the foregoing have also been furnished by U.S. Mail to the following interested persons on this 13th day of April, 2022:

United States Attorney's Office
Linda Julin McNamara, AUSA
Appellate Division
400 North Tampa Street, Suite 3200
Tampa, FL 33602

Pollock USP
Napoleon Harris, Defendant
USM# 60847-018
P.O. Box 2099
Pollock, LA 71467

*/s/ Frank Louderback*
FRANK LOUDERBACK, ESQ.
450 Carillon Parkway, Ste. 120
St. Petersburg, FL 33716
(727) 896-2147; Fax (727) 556-0447
FBN 193295
LoudHel@aol.com
Attorney for Defendant-Appellant

## CERTIFICATE OF FONT COMPLIANCE

Pursuant to 11th Cir. Rule 32(a)(7)(B), the undersigned hereby certifies that this brief contains __4,979__ words.

*/s/ Frank Louderback*
FRANK LOUDERBACK, ESQ.